OPINION OF THE COURT
 

 Per Curiam.
 

 This appeal — here on a question of statutory interpretation certified to us by the United States Court of Appeals for the Second Circuit — requires us to determine whether Civil Service Law § 204-a (1) makes "the compensation sections of collective bargaining agreements to which it applies conditional upon or subject to annual legislative appropriations.” For the reasons that follow, we answer that question in the negative.
 

 I.
 

 This action was brought in the United States District Court for the Southern District of New York as a constitutional challenge to legislation enacted by the State of New York (L 1990, ch 190, § 375), which provided that, as of March 1991, the salaries of nonjudicial officers and employees of the New York State Unified Court System hired on or after April 7, 1983 would be payable by the State two weeks after they became due. (Court employees hired before April 7, 1983 and other State employees were already subject to a two-week delay.)
 

 The State Comptroller implemented the legislative direction by a "lag payroll”: commencing November 7, 1990, affected employees were paid 9 rather than 10 days’ salary in each two-week pay period, for 10 periods. As a result, during the 1990-1991 fiscal year ending March 31, 1991, employees were paid for 50 rather than 52 weeks of work. Withheld amounts were to be repaid upon termination of employment at the employees’ then rate of salary.
 

 Plaintiffs are 11 labor organizations representing nonjudicial employees and 11 individual employees of the court system. Each of the labor organizations was a party to a collective bargaining agreement with the Unified Court System for the three-year period from April 1, 1988 to March 31, 1991. Each agreement provided that "Bi-weekly salaries will be computed on the basis of 10 working days.”
 

 Plaintiffs contend that the lag payroll violates the provision
 
 *148
 
 of their contracts that salaries will be computed on the basis of 10 working days; that the legislation authorizing the lag payroll is an unconstitutional impairment of their contracts (US Const, art I, § 10); and that the law transgresses their equal protection and due process rights (US Const 14th Amend).
 

 The District Court granted summary judgment for the State (749 F Supp 97). It concluded that the collective bargaining agreements were not impaired because each agreement contained the following clause, as required by Civil Service Law § 204-a (1):
 

 "It is agreed by and between the parties that any provision of this agreement requiring legislative action to permit its implementation by amendment of law or by providing the additional funds therefor, shall not become effective until the appropriate legislative body has given approval.”
 

 The District Court read this clause to mean that the compensation sections of the collective bargaining agreements were provisions "requiring legislative action to permit [their] implementation * * * by providing the additional funds therefor,” and as a result that the compensation sections took effect only when the Legislature appropriated money for that purpose. The court rejected plaintiffs’ argument that the Legislature had given the requisite "approval” by ratifying the agreements, concluding that since the Legislature’s appropriation for the court system for fiscal year 1990-1991 contemplated the lag payroll, there was no contractual impairment. Alternatively, the court held that any impairment was "reasonable and necessary” because of the State’s budget crisis, and that there was no due process or equal protection violation.
 

 After argument of plaintiffs’ appeal, the Second Circuit, noting the District Court’s decision and the decision of Supreme Court, Albany County, holding the lag payroll unconstitutional
 
 (Matter of Quirk v Regan,
 
 148 Misc 2d 300), certified that a novel question of State law was presented, with serious implications for the State’s obligations with respect to its public employment contracts. The court therefore asked us to decide the unsettled threshold question of New York statutory law: whether section 204-a (1) makes "the compensation sections of collective bargaining agreements to which it applies conditional upon or subject to annual legislative appropriations.” No constitutional issue is presented.
 

 
 *149
 
 On April 4, 1991, we accepted the certified question for review (77 NY2d 933).
 

 II.
 

 Section 204-a (1) is part of article 14 of the Civil Service Law — the Public Employees’ Fair Employment Act, also known as the Taylor Law. Section 204-a (1) provides that written agreements between public employers and employee organizations determining the terms and conditions of employment must contain — as did the contracts in this case — notice that any provision requiring "legislative action to permit its implementation by amendment of law or by providing the additional funds therefor, shall not become effective until the appropriate legislative body has given approval.”
 

 Accepting the State’s arguments, the District Court held that the legislative history of the clause meant that it was "susceptible of but one meaning — that legislative appropriations are necessary before compensation or salary provisions of collective bargaining agreements become effective.” (749 F Supp, at 101.) This reading finds its best support in the statutory reference to provisions "requiring legislative action to permit [their] implementation * * * by providing the additional funds therefor”. As with any other expenditure of funds by the State, money for public employees’ salaries must be appropriated by the Legislature each year (NY Const, art VII, § 7;
 
 Anderson v Regan,
 
 53 NY2d 356, 359). One possible interpretation of the statute, therefore, is that each year’s compensation provisions require "additional funds,” and are not effective until the Legislature gives its approval by appropriating money for that purpose.
 

 That, however, is not the only possible reading of the statute. In our view, the construction advanced by plaintiffs is equally plausible.
 

 Plaintiffs do not dispute the necessity for a legislative appropriation before State funds may be paid as salary to public employees. What they do dispute is an interpretation of the statute that equates legislative "approval” with annual appropriations. In plaintiffs’ view, the statute requires only one legislative "approval”: ratification of the collective bargaining agreement by the Legislature. Once that approval is given, the contract binds the State. Nothing in the statute, plaintiffs contend, requires that approval be given more than
 
 *150
 
 once or permits the State to evade its obligations by simply failing to appropriate the necessary funds.
 

 The disagreement between the parties thus centers on the meaning of "approval” in section 204-a (1). The State defendants urge that "approval” is not a one-step process, that initial approval of a contract does not end the Legislature’s role, and that each year’s appropriation of funds is a separate "approval” of the compensation provisions of collective bargaining agreements. In contrast, plaintiffs argue that the Legislature’s ratification of the three-year agreements constituted the only "approval” required by the statute. While the State’s interpretation is consistent with the statutory reference to "legislative action to permit its implementation * * * by providing the additional funds therefor,” plaintiffs’ interpretation is supported by the fact that the statute refers only to legislative approval, not to multiple approvals during the life of a contract.
 

 Given the plausibility of each interpretation, we reject both parties’ contentions that the plain language of the statute compels one construction over the other, and turn to other sources for guidance in applying Civil Service Law § 204-a (1) to the facts before us. We begin with the legislative history of section 204-a (1).
 

 III.
 

 Section 204-a (1) was enacted in 1969, two years after the Taylor Law, as one of a number of amendments to that law.
 

 The District Court rested its reading of section 204-a (1) on a Memorandum of the Senate Rules Committee stating that a purpose of the amendments was to "obviate confusion as to the effect of an agreement between an employer and employee organization by making clear (through a change in the definition of 'agreement’ and by requiring notice to all employees) that legislative action is needed before the agreement becomes effective as to those provisions requiring legislative approval such as, for example, the appropriation of funds for salaries” (1969 McKinney’s Session Laws of NY, at 2365). From this statement the District Court concluded that section 204-a (1) meant that "legislative appropriations are necessary before compensation or salary provisions of collective bargaining agreements become effective.” (749 F Supp, at 101.)
 

 The quoted statement of legislative purpose establishes that the objective of the amendment creating section 204-a (1) was
 
 *151
 
 to make explicit the requirement of legislative approval of certain types of provisions — in particular, those requiring the appropriation of funds — contained in collective bargaining agreements. That statement does not, however, answer the question posed by this case — whether the requisite "approval” consists of the Legislature’s initial ratification of a three-year collective bargaining agreement, or the annual appropriations of the necessary funds. We cannot agree, therefore, that this legislative history in any way settles the question before us.
 

 Like the District Court, we find no additional guidance in the balance of the legislative history of section 204-a (1). It is clear from documents contained in the Bill Jacket relating to the 1969 amendments that controversy focused on proposals relating to fines and the forfeiture of membership dues. The amendment with which we are concerned received scant attention. Indeed, neither the Interim Report of the Governor’s Committee on Public Employee Relations (dated June 17, 1968), nor its second report (dated Jan. 23, 1969) containing specific suggestions for amendments to the Taylor Law, even mentions the amendment codified as section 204-a (1). The 1969 Report of the Select Joint Legislative Committee on Public Employee Relations (1969 NY Legis Doc No. 14, at 20), which was prepared subsequent to the passage of the 1969 amendments, confirms that the purpose of the amendment was to "preserve to the legislative body its independence in approving commitments made by the chief executive officer in negotiations,” but is silent as to the meaning of "approval.”
 

 Thus, the only conclusion we can draw from the legislative history of section 204-a (1) is that it sheds no light on the question before us.
 

 IV.
 

 "[A] primary command to the judiciary in the interpretation of statutes is to ascertain and effectuate the purpose of the Legislature,” and in "finding such purpose, one should look to the entire statute, its legislative history and the statutes of which it is made a part”
 
 (Rankin v Shanker,
 
 23 NY2d 111, 114). These elemental principles of statutory interpretation focus our attention on the Taylor Law and its history.
 

 The Taylor Law, effective September 1, 1967, was the consequence of recommendations put forward by the Governor’s Committee on Public Employee Relations, headed by Professor George W. Taylor. In approving the legislation, the Governor
 
 *152
 
 noted that he had been prompted to appoint the committee because the need for a change in the law had been "unquestionably demonstrated over the years by the utter inadequacy of the Condon-Wadlin law to resolve paralyzing strikes and threats of strikes by public employees” (1967 McKinney’s Session Laws of NY, at 1527).
 

 The Condon-Wadlin Act (Civil Service Law former § 108) prohibited strikes in public employment and provided severe penalties for public employees who did strike. Perhaps because of its harshness, the act failed in its purpose (Staff Report to Joint Legis Comm on Industrial & Labor Conditions, at 2 [Aug. 1962], quoted in Ruffo,
 
 The Residue of Sovereignty in New York Public Employment,
 
 39 Alb L Rev 165, 177, n 71). "Public employees violated that law freely, since they knew that the public did not want these penalties administered and that public officials were reluctant to administer them.” (Note,
 
 Good Faith Bargaining Under the Taylor Law,
 
 39 Brooklyn L Rev 658, 660 [1973].) It was "common knowledge that the 'automatic’ penalty provisions of Condon-Wadlin have never been enforced (with but two exceptions) over an almost 20-year period, in which the strikes by public employees have been too numerous to recall or record”
 
 (Matter of Di Maggio v Brown,
 
 19 NY2d 283, 289).
 

 Against this background, on January 15, 1966, the Taylor Committee was established by Governor Rockefeller. The Governor requested that the Committee "make legislative proposals for protecting the public against the disruption of vital public services by illegal strikes, while at the same time protecting the rights of public employees.” (Governor’s Committee on Public Employee Relations, Final Report [Taylor Committee Report], Mar. 31, 1966, at 9 [reprinted in 1966 Public Papers of Governor Rockefeller, at 878
 
 et seq.].)
 

 The Taylor Committee found that there were sound reasons for continuing the prohibition against strikes by public employees, noting that instead of "the constraints of the market place on collective bargaining, including the right to strike, which are in the private sector, negotiations in the public sector are subject to the constraints imposed by democratic political processes.” As a result, while a "work stoppage in the private sector involves costs primarily to the direct participants,” "a strike of government employees * * * introduces an alien force in the legislative processes.” (Taylor Committee Report, at 15.) Therefore, while recommending repeal of the
 
 *153
 
 Condon-Wadlin Act, the Taylor Committee also advised that the statutory prohibition against public employee strikes be continued (Taylor Committee Report, at 6, 8, 18).
 

 At the same time, however, the Taylor Committee concluded that it "is elementary justice to assure public employees, who are estopped from using the strike, that they have the right to negotiate collectively.” (Taylor Committee Report, at 20.) The Committee found that public employee strikes "have often been caused by a feeling of futility on the part of public employees because of the absence of other means by which they could participate in the determination of the terms and conditions of their employment,” and that in "some instances their inability to form or join organizations which are assured of standing as recognized representatives has contributed to this sense of futility and has led them into strike action.” (Taylor Committee Report, at 42.) To solve this problem, the Committee recommended that public employees be permitted to organize and negotiate with public employers.
 

 As enacted, therefore, the Taylor Law had two purposes: "to promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government.” (Civil Service Law § 200.) In approving the legislation the Governor confirmed that the purpose of the law was both to secure fair treatment for public employees and to protect the public, stating that the legislation "ushers in a new age of public employee relations in New York State” and that it "proclaims the rights of government employees, yet recognizes the special obligations borne by those who provide the vital services of government.” (1967 McKinney’s Session Laws of NY, at 1527.)
 

 Present practice under the Taylor Law overwhelmingly favors multiyear collective bargaining agreements. Nearly all of the contracts on file with the Public Employment Relations Board for the period 1988-1991 were multiyear contracts. That multiyear contracts further the purposes of the Taylor Law by avoiding the unrest of perpetual labor negotiations, and by allowing parties to balance out their demands and concessions over longer periods of time, is manifest.
 

 While the Taylor Law does not require multiyear agreements, it explicitly contemplates them
 
 (see, e.g.,
 
 Civil Service Law § 201 [12]; § 208 [2] [b]; § 209 [4] [c] [vi]). Significantly, public employers are forbidden to refuse to continue the terms
 
 *154
 
 of an expired agreement while a new one is being negotiated (Civil Service Law § 209-a [1] [e]).
 

 In interpreting provisions of the Taylor Law — including section 204-a (1) — we of course must give weight to its statutory purposes, and to the provisions that express a policy in favor of multiyear collective bargaining agreements. Of the two possible readings of section 204-a (1), only plaintiffs’ construction furthers those purposes.
 

 As defendants would interpret section 204-a (1), the Legislature decides anew each year whether to approve — or to disapprove — the compensation provisions of multiyear collective bargaining agreements when it appropriates funds for that purpose. While "compensation” is principally regarded as salary, it has also been held that "compensation” under particular contracts included insurance
 
 (Matter of Town of Haverstraw v Newman,
 
 75 AD2d 874), pensions, vacations and military leave
 
 (Matter of Teachers Assn. v Board of Educ.,
 
 34 AD2d 351, 353), even uniform allowances
 
 (City of Auburn v Auburn Firefighters,
 
 6 PERB ¶ 4512). Moreover, other contract terms may also require expenditure of funds by the public employer. Under defendants’ interpretation, therefore, not only salary terms but all contract provisions requiring an expenditure of additional funds by a public employer would be at risk of annual revision through the appropriations process.
 

 Defendants do not suggest that plaintiff labor organizations have any power corresponding to the Legislature’s unilateral power to modify the provisions of multiyear collective bargaining agreements that require expenditures, or that they have any recourse when the Legislature chooses to exercise that power — though plaintiffs are prohibited from striking (Civil Service Law § 210 [1]). Thus, under defendants’ view, the provisions of multiyear collective bargaining agreements are one-sided: they are binding on labor organizations for their full terms, but subject to annual revision by the Legislature.
 

 This imbalance conflicts with the Taylor Law policy in favor of collective bargaining agreements for periods longer than one year. Defendants deny that their interpretation will have any effect on the extent to which labor organizations are willing to enter into multiyear collective bargaining agreements, and suggest that "the negotiation of single or multiyear agreements in the future will be a function of the parties’ respective confidence in, and the predictability .of, the condition of the State’s economy.” While the State’s economic
 
 *155
 
 health is undoubtedly relevant to such negotiations, we are unable, to accept the contention that labor organizations will be undeterred from entering multiyear collective bargaining agreements with public employers if we adopt defendants’ interpretation of section 204-a (1). As plaintiffs and the
 
 amici
 
 urge, employees would not likely agree to be bound for several years by compensation provisions of a collective bargaining agreement that did not also bind the employer.
 

 We thus conclude that defendants’ interpretation of section 204-a (1) is inconsistent with the language and purposes of the Taylor Law.
 

 V.
 

 A legislative construction of a statute may be implied from legislative action (McKinney’s Cons Laws of NY, Book 1, Statutes § 75 [a]). "A uniform course of action involving the right to the exercise of an important power by the State government without question is no unsatisfactory evidence that the power is rightfully exercised”
 
 (Matter of Koenig v Flynn,
 
 258 NY 292, 300,
 
 affd
 
 285 US 375). Here, the converse is true: the legislation, ratifying the collective bargaining agreements at issue here, and the Legislature’s past practice in such matters, demonstrate that the Legislature has never regarded itself as having the power to approve separately each year of an approved multiyear collective bargaining agreement.
 

 The 1988-1991 contracts of most of the labor organization plaintiffs were ratified effective April 1, 1988 (L 1988, ch 787).
 
 [1]
 
 The language used in ratifying these agreements supports plaintiffs’ reading of the statute over the State’s.
 

 The ratification statute begins with the declaration that the "purpose of this act is to
 
 implement these agreements”
 
 (L 1988, ch 787, § 1 [emphasis supplied]). No limitation is expressed; the language used is keyed precisely to section 204-a (1). Moreover, the ratification statute explicitly approves the pay increases scheduled for each year of the three-year agreement
 
 (see,
 
 L 1988, ch 787, § 8 [b], [c], [d]), thus supporting plaintiffs’ contention that by ratifying the agreements the Legislature gave "approval” within the meaning of section 204-a (1) to the
 
 *156
 
 entire three-year obligation expressed in the contract, not simply to its first year.
 

 Apart from the statute ratifying the agreements here, the Legislature’s past practice with regard to multiyear collective bargaining agreements has been consistent with plaintiffs’ position. Plaintiffs contend — and defendants do not deny — that the Legislature’s practice has been to ratify such agreements once and thereafter to appropriate the necessary money.
 
 [2]
 
 The Legislature has not previously asserted any separate right to disapprove the compensation sections of multiyear collective bargaining agreements. Neither the lag payroll legislation nor the Governor’s Memorandum of approval suggested that the Legislature was exercising a right under section 204-a (1) to withhold approval of previously ratified collective bargaining agreements (L 1990, ch 190, § 375; 1990 McKinney’s Session Laws of NY, at 2707).
 

 Another relevant aspect of past practice is that, so far as the record discloses, the State has never béfore unilaterally imposed a lag payroll on its employees. While lag payrolls were imposed on executive branch and court system employees during 1982-1983, in both instances that was done pursuant to negotiated agreement.
 

 In short, a review of the Legislature’s ratification of the collective bargaining agreements here and its past practice reveal a consistent course of action supporting plaintiffs’ interpretation of section 204-a (1) over the State’s.
 

 VI.
 

 Thus, we conclude that Civil Service Law § 204-a (1) does not make the compensation sections of the collective bargaining agreements before us conditional upon or subject to annual legislative appropriations. We reach this conclusion from the language of section 204-a (1), considered in the light of legislative history and past practice.
 

 Accordingly, the certified question should be answered in the negative.
 

 Judges Simons, Kaye, Alexander, Titone, Hancock, Jr.,
 
 *157
 
 and Bellacosa concur in Per Curiam opinion; Chief Judge Wachtler taking no part.
 

 Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.17 of the Rules of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the negative.
 

 [1]
 

 . Laws of 1988 (ch 787) did not ratify agreements with all the labor organizations that are plaintiffs here, but no contention is made that that act is materially different from legislation ratifying agreements with the other plaintiffs.
 

 [2]
 

 . Appendix B to the brief submitted by
 
 amicus
 
 New York State Inspection, Security and Law Enforcement Employees, District Council 82, AFSCME, demonstrates that this has been the Legislature’s practice with regard to the collective bargaining agreements between that union and the court system.