940 F.2d 766
 138 L.R.R.M. (BNA) 2064, 60 USLW 2115
 ASSOCIATION OF SURROGATES AND SUPREME COURT REPORTERS WITHIN
the CITY OF NEW YORK, Mary O'Leary, President, Citywide
Association of Law Assistants, Barbara Brown, President,
Court Attorneys Association of the City of New York, Robert
A. Mulhall, President, Court Officers Benevolent Association
of Nassau Co., Jeffrey Pollack, President, District Council
37, American Federation of State, County & Municipal
Employees & Local 1070, Paul Shelkin, President, Local 704,
Service Employees International Union, John Walsh,
President, New York State Supreme Court Officers
Association, ILA, Local 2013, AFL-CIO, John McKillop,
President, Ninth Judicial District Court Employees
Association, Inc., Martin Sharp, President, Suffolk County
Court Employees Association, Inc., Thomas F. McGuinness,
President, the Communication Workers of America, AFL-CIO,
Local 1180, Arthur Cheliotes, President, Civil Service Forum
Local 300, SEIU, Salvatore Cangiarella, President, Janet
Foster, Susan Glasbrenner, Michael Sullivan, David Richman,
Greg Snigor, James Di Napoli, William Rosario, Abel Peltro,
George F. Berghorn, Lisa Rosenzweig, and Michael Smith,
Plaintiffs-Appellants,
v.
STATE OF NEW YORK, Edward V. Regan, as Comptroller of the
State of New York, Robert Abrams, as Attorney General of the
State of New York, Matthew T. Crosson, as Chief
Administrator of the Unified Court System and the State of
New York Unified Court System, Defendants-Appellees.
 No. 1167, Docket 90-9036.
 United States Court of Appeals,
Second Circuit.
 Argued March 8, 1991.
Question Certified March 22, 1991.
Submitted After Answer to
Certified Question June 27, 1991.
 Decided July 31, 1991.
 
 David Schlachter, Commack, N.Y. (Schlachter & Mauro, of counsel), for plaintiffs-appellants.
 Andrea Green, New York City, Asst. Atty. Gen. of the State of N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y.), for defendants-appellees State of N.Y., Edward V. Regan, and Robert Abrams.
 Kenneth Falk, New York City (Michael Colodner, Office of Court Admin., of counsel), for defendant-appellee Matthew T. Crosson.
 Edward J. Groarke, Garden City, N.Y. (Colleran, O'Hara & Mills, Richard L. O'Hara, Scott P. Shelkin, of counsel), for amicus curiae New York State AFL-CIO.
 Nancy E. Hoffman, Albany, N.Y. (Jerome Lefkowitz, Marilyn S. Dymond, of counsel), for amicus curiae Civil Service Employees Ass'n, Inc.
 Vincent F. Pitts, New York City (Shea & Gould, Eve I. Klein, of counsel), for amicus curiae New York State Court Clerks Ass'n.
 Bernard F. Ashe, Albany, N.Y. (Kevin H. Harren, Rocco A. Solimando, of counsel), for amicus curiae New York State United Teachers.
 Brian J. O'Donnell, Albany, N.Y. (Rowley, Forrest, O'Donnell & Hite, P.C., Steven R. Kramer, of counsel), for amicus curiae New York State Inspection, Sec., and Law Enforcement Employees Dist. Council 82, AFSCME, AFL-CIO.
 Before KAUFMAN, KEARSE and PRATT, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 Two of the chronic problems of modern government--a budget crunch and an overworked court system--intersect to create this contract-clause challenge to New York State's "lag payroll" law. The question before us is whether, in seeking to solve both problems through this lag-payroll scheme, the state may constitutionally finance an expansion of its court system by deferring the wages of certain court employees contrary to their collective bargaining agreements. Our answer is "no", because the lag-payroll legislation, as interpreted by the New York Court of Appeals, violates the contract clause of the federal constitution.FACTS AND BACKGROUND
 
 
 2
 In December 1989 New York's judiciary made a budget request of $972.9 million for the fiscal year beginning April 1, 1990. This request was transmitted to the governor for inclusion in the state budget, pursuant to N.Y. Const. art. VII, Sec. 1. The judiciary's budget request sought to create new judgeships and court positions in order to cope with "the exploding drug crisis" in the state, to increase the compensation of sitting judges, and to fund a number of collectively-bargained employee contracts.
 
 
 3
 At the same time, the state was facing a fiscal crisis. Instead of approving it outright, the legislature reduced the judiciary's budget request by $69.1 million, and refused to allow the requested judicial salary increases. Apparently recognizing a need for increased trial capacity and related staff, the legislature nevertheless approved the creation of the new judgeships and other court positions.
 
 
 4
 To help finance the new positions and to save $7 million, the legislature imposed a "lag payroll" on the nonjudicial employees of the Unified Court System. That legislation, set forth in 1990 N.Y.Laws ch. 190, Sec. 375 amending Sec. 5(b), reads as follows:
 
 
 5
 (1) Notwithstanding the provisions of subdivision a of this section or of section 200 of the state finance law, commencing with the last bi-weekly payroll period ending at least fourteen days before March 31, 1991 for each nonjudicial officer or employee, the salary or wages of such officer or employee shall be payable by the state two weeks after they shall have become due. Until such time, an alternative procedure for payment of salaries and wages, to be determined by the comptroller, may be implemented in lieu of the procedure specified in subdivision 1 of such section 200 or in other provisions of law. The procedures set forth in this paragraph (including any alternative procedure determined by the comptroller) shall remain in effect until the state and an employee organization representing nonjudicial officers and employees who are in positions which are in collective negotiating units established pursuant to article 14 of the civil service law enter into an agreement providing otherwise for the payment of salaries and wages to such officers and employees.
 
 
 6
 (2) The provisions of paragraph 1 of this subdivision shall not apply to any alternative procedure for the payment of salaries and wages to nonjudicial officers and employees that was adopted pursuant to law and in effect immediately preceding the effective date of this subdivision.
 
 
 7
 The effect of this section is to delay payment of the affected employees' salaries until two weeks after those salaries are earned. Prior to implementation of Sec. 375, the affected employees had been paid their bi-weekly salaries immediately after the two weeks were worked. To phase in this two-week lag, the comptroller, as authorized by Sec. 375, adopted an "alternative procedure" for paying salaries beginning November 7, 1990. Under that procedure, the affected employees were paid nine days' salary for the ten days worked in each pay period for ten two-week periods. Thus, for the fiscal year which ended March 31, 1991, affected employees were paid for 50 weeks' work instead of 52. The two weeks' pay thus withheld will be payable to the employees at the termination of their employment with the state at the rate of pay applicable to them at the time of termination.
 
 
 8
 This was not the first lag payroll imposed on judiciary employees. In 1982, during negotiations for the 1982-1985 contract period, the Unified Court System and the collective bargaining representatives for employees of the courts agreed to the establishment of a lag payroll provided a similar lag payroll was to be implemented for the majority of executive branch employees. A lag payroll was in fact implemented on most executive branch employees in 1982, and the judicial branch lag payroll commenced on November 18, 1982. This lag payroll was in effect until April 6, 1983, and applied only to those employees on the payroll during that period. Thus, Sec. 375 amending Sec. 5(b)(2) exempts from the current lag payroll those employees who had been subject to the previous negotiated one.
 
 
 9
 Each of the eleven individual plaintiffs is a court employee affected by the lag payroll, and each of the eleven plaintiff labor organizations is a party to a three-year collective bargaining agreement with New York's Unified Court System. Although the terminology varies slightly among some of the agreements, each essentially contains the following article:
 
 SALARY COMPUTATION
 
 10
 Bi-weekly salaries will be computed on the basis of 10 working days.
 
 
 11
 In addition, N.Y. State Finance Law Sec. 200(1) provides: "The salaries of all officers of the state and the wages of all employees thereof shall be due from and payable by the state bi-weekly." This provision was expressly superseded by the lag payroll legislation for the pertinent time period.
 
 
 12
 Plaintiffs filed this action in the Southern District of New York, asserting three federal constitutional violations. They claimed (1) that the lag-payroll legislation violated the contract clause, (2) that it constituted a deprivation of property without due process of law, and (3) that it violated the equal protection clause of the fourteenth amendment. The plaintiffs sought a declaration that the lag-payroll legislation was unconstitutional, an injunction prohibiting defendants from implementing the lag payroll, and damages in the form of restitution of any salary withheld under the system.
 
 
 13
 In an opinion reported at 749 F.Supp. 97 (S.D.N.Y.1990), Judge Patterson granted summary judgment for the defendants. He reasoned, first, that there was no contractual impairment at all, because each collective bargaining agreement contained the following provision, as mandated by N.Y.Civ.Serv.Law Sec. 204-a(1):
 
 
 14
 It is agreed by and between the parties that any provision of this agreement requiring legislative action to permit its implementation by amendment of law or by providing the additional funds therefor, shall not become effective until the appropriate legislative body has given approval.
 
 
 15
 Judge Patterson interpreted this provision as contemplating a separate legislative appropriation in each fiscal year in order to implement the compensation provisions of the three-year collective bargaining agreements. 749 F.Supp. at 100-01.
 
 
 16
 Secondly, Judge Patterson held that, should his interpretation of Sec. 204-a(1) be incorrect, any impairment of contractual rights was reasonable and necessary to further an important public purpose under the test enunciated in United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 25, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977). 749 F.Supp. at 101. Judge Patterson granted summary judgment on the plaintiffs' due process and equal protection claims as well. 749 F.Supp. at 101-02.
 
 
 17
 On appeal, the plaintiffs renew only their contract-clause challenge to the lag-payroll legislation, claiming (1) that the district court erred in its interpretation of Sec. 204-a(1) and (2) that the legislation violated the contract clause.
 
 DISCUSSION
 A. Civil Service Law Sec. 204-a(1)
 
 18
 The district court rested its holding on its construction of N.Y.Civ.Serv.Law Sec. 204-a(1). Noting that the district court's decision on Sec. 204-a(1) conflicted with the decision of the New York Supreme Court, Albany County, in Matter of Quirk v. Regan, 148 Misc.2d 300, 565 N.Y.S.2d 422 (N.Y.Sup.Ct., Albany Cty.1991), we certified the statutory issue to the New York Court of Appeals with the following question:
 
 
 19
 Does N.Y.Civ.Serv.Law Sec. 204-a(1) make the compensation sections of collective bargaining agreements to which it applies conditional upon or subject to annual legislative appropriations?
 
 
 20
 On June 27, 1991, the New York Court of Appeals answered this question in the negative. See 78 N.Y.2d 143, 577 N.E.2d 10, 573 N.Y.S.2d 19 (1991).
 
 
 21
 The New York Court of Appeals determined, contrary to the conclusion of the district court, that Sec. 204-a(1) "does not make the compensation sections of the collective bargaining agreements before us conditional upon or subject to annual legislative appropriations." Association of Surrogates, 78 N.Y.2d at 156, 577 N.E.2d at 16, 573 N.Y.S.2d at 25. Reasoning that the district court's interpretation of Sec. 204-a(1) conflicted with the Taylor Law's twin goals of protecting collective bargaining rights and encouraging multi-year contracts, the New York Court of Appeals unanimously decided that the contracts became valid when ratified. Id., 78 N.Y.2d at 156, 577 N.E.2d at 16, 573 N.Y.S.2d at 25. Thus, the district court's holding that there was no contractual impairment was erroneous as a matter of New York law. The only matter remaining for our determination is whether the district court's alternative holding--"that the impairment was a reasonable and necessary one"--was correct.
 
 B. Contract Clause
 
 22
 Article I, Sec. 10, clause 1 of the United States Constitution reads, in pertinent part:
 
 
 23
 No state shall * * * pass any * * * Law impairing the Obligation of Contracts * * *.
 
 
 24
 This clause is "one of the few 'rights-protecting' provisions in the original Constitution", G. Stone, L. Seidman, C. Sunstein & M. Tushnet, Constitutional Law 1428 (1986), and has been called by one legal historian "the bulwark of American individualism against democratic impatience and socialistic fantasy." H. Maine, Popular Government 247-48 (1885).
 
 
 25
 Despite the seemingly absolute language of the contract clause, finding an "impairment" of contract is merely a threshold step toward "resolving the more difficult question whether that impairment is permitted under the Constitution." United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 21, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977). This "more difficult question" is resolved by balancing the contractual rights of the individual against "the 'essential attributes of sovereign power' necessarily reserved by the States to safeguard the welfare of their citizens." Id. (quoting Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1934)) (citation omitted). Once "impairment" is found, there are two further steps to our inquiry. First, we must determine whether the legislation operates to "substantially" impair contractual obligations. Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983). Then, should the impairment be more than a "minimal" one, we must move on "to a careful examination of the nature and purpose of the state legislation." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978).
 
 
 26
 Generally, legislation which impairs the obligations of private contracts is tested under the contract clause by reference to a rational-basis test; that is, whether the legislation is a "reasonable" means to a "legitimate public purpose". United States Trust Co., 431 U.S. at 22-23, 97 S.Ct. at 1517-1518. "As is customary in reviewing economic and social regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." Id. (citing East New York Savings Bank v. Hahn, 326 U.S. 230, 66 S.Ct. 69, 90 L.Ed. 34 (1945)).
 
 
 27
 But courts are not so deferential when the state's legislation is self-serving and impairs the obligations of its own contracts. In this situation, a more searching analysis under the contract clause is appropriate:
 
 
 28
 The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.
 
 
 29
 United States Trust Co., 431 U.S. at 25-26, 97 S.Ct. at 1519-1520 (footnotes omitted).
 
 
 30
 1. "Substantial" impairment?
 
 
 31
 Initially, the defendants argue that the contractual impairment at issue is "minimal at best", and therefore does not rise to the level of a "substantial" impairment meriting contract-clause analysis. Citing Spannaus, 438 U.S. at 245, 98 S.Ct. at 2723, the defendants argue that since the impairment is "minimal", we "may end the [contract-clause] inquiry at its first stage." Id. We disagree.
 
 
 32
 The Supreme Court has noted that "[t]he severity of the impairment measures the height of the hurdle the state legislation must clear." Id. See also Castellano v. Board of Trustees, 937 F.2d 752, 757 (2d Cir.1991). However, the Court in Spannaus went on to define the "severity" of a contractual impairment:
 
 
 33
 The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.
 
 
 34
 Spannaus, 438 U.S. at 245, 98 S.Ct. at 2723.
 
 
 35
 Guided by Spannaus, we cannot agree that the contractual impairment created by the lag payroll was "minimal". The lag payroll has the effect of withholding ten percent of each employee's expected wages over a period of twenty weeks and postponing their payment indefinitely. For instance, a 25-year-old employee would not be repaid her lagged wages until she leaves the state's employ--perhaps 45 years, should she devote her entire career to governmental service. The affected employees have surely relied on full paychecks to pay for such essentials as food and housing. Many have undoubtedly committed themselves to personal long-term obligations such as mortgages, credit cards, car payments, and the like--obligations which might go unpaid in the months that the lag payroll has its immediate impact. Cf. Sniadach v. Family Finance Corp. of Bay View, 395 U.S. 337, 342 n. 9, 89 S.Ct. 1820, 1823 n. 9, 23 L.Ed.2d 349 (1969) (" 'For a poor man * * * to lose part of his salary often means his family will go without the essentials. * * *.' ") (quoting statement of Congressman Gonzales, 114 Cong.Rec. 1833). Indeed, it would be inconsistent for us to accept the defendants' argument that this impairment was necessary because of a governmental fiscal crisis, and to do so by disregarding the personal fiscal crises that the lag payroll would create.
 
 
 36
 Furthermore, the defendants' argument is severely undercut by the presence of a specific, separately-enumerated term in each of the collective bargaining agreements which requires that bi-weekly salaries be paid on the basis of ten working days. This term cannot be dismissed as "minimal" in light of the state's past history of imposing lag payrolls only by agreement, see Association of Surrogates, 78 N.Y.2d at 149, 577 N.E.2d at 12, 573 N.Y.S.2d at 21 (lag payrolls imposed, by negotiated agreement, on executive branch and court system employees during 1982 and 1983). We conclude, therefore, that the impairment of the state's contractual obligations was substantial.
 
 
 37
 2. Reasonable and necessary to serve an important public purpose?
 
 
 38
 Since we have determined that the impairment is substantial and not "minimal", it can survive scrutiny only if it is "reasonable and necessary to serve an important public purpose." United States Trust Co., 431 U.S. at 25, 97 S.Ct. at 1519. The defendants' position in this regard is neatly summed up in this paragraph from defendant Crosson's brief:Instead of enacting the lag payroll legislation, the Legislature could have sought to save $7.0 million by disapproving the filling of any of the new positions or judgeships requested by the Judiciary--in short, by cutting court programs. However, the Legislature was well aware that reducing court resources would only further exacerbate the crisis in the courts, and so it chose a method that would save money within the State's fiscal constraints without making program reductions--it would defer a small percentage of employee salaries. Clearly, this temporary, prospective enactment served the important purpose of providing necessary funding to enable the Judiciary to fulfill its mission, and it was an appropriate, reasonable and necessary means of achieving this end.
 
 
 39
 See also affidavit of Matthew T. Crosson p 6, at 5-6 ("The Legislature elected to maintain, and slightly expand, those court positions and operations deemed vital to the system, and toward this end the lag payroll legislation was enacted.").
 
 
 40
 Crosson's affidavit and brief, we believe, give us sufficient reason to reverse the district court's determination. Assuming, for the sake of argument only, that the maintenance and expansion of the New York court system constitutes an "important public purpose", the means chosen by the state are, quite obviously, in no way "necessary" to the achievement of the stated goals.
 
 
 41
 It cannot be said that a lag payroll for only judicial employees was essential in order to finance the expansion of the court system. The state could have shifted the seven million dollars from another governmental program, or it could have raised taxes. We recognize that neither alternative would have been popular among politician-legislators, but that is precisely the reason that the contract clause exists--as a "constitutional check on state legislation". Spannaus, 438 U.S. at 241, 98 S.Ct. at 2720. In fact, the lag-payroll scheme smacks of the political expediency that United States Trust Co. warned of: "A governmental entity can always find a use for extra money, especially when taxes do not have to be raised." 431 U.S. at 26, 97 S.Ct. at 1519. Clearly, the New York legislators and its governor would prefer not to raise the taxes of their constituents; by placing the costs of improvements to the court system on the few shoulders of judiciary employees instead of the many shoulders of the citizens of the state, they ruffle only a few feathers and fight the "exploding drug crisis" without raising taxes or cutting other governmental programs. But the only people paying for the new courts are the few employees of the judicial branch who are subjected to the lag payroll. The contract clause bars such expedient post hoc changes in contractual obligations, for "a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives." United States Trust Co., 431 U.S. at 30-31, 97 S.Ct. at 1521-1522.
 
 
 42
 The defendants view the lag payroll as a financial device that the legislature may properly employ, and they praise the district court for not acting as a "superlegislature" or "attempt[ing] to second-guess which legislative action would have better solved the perceived problems" caused by the budget crunch. But if the federal judiciary's proper role were as supine as defendants assert it to be, the contract clause would be a "dead letter", contrary to the instruction of Spannaus that "the Contract Clause remains part of the Constitution." Spannaus, 438 U.S. at 241, 98 S.Ct. at 2721.
 
 
 43
 In sum, on April 1, 1988, the State of New York promised the affected judicial employees, inter alia, that they would be paid bi-weekly, "on the basis of ten workdays." For 20 weeks from November 1990 through February 1991 the State of New York paid these employees on the basis of only nine workdays, and used the resulting savings to finance an expansion of its court system. But the contract clause, which "limits * * * the power of a State to abridge existing contractual relationships", Spannaus, 438 U.S. at 242, 98 S.Ct. at 2721, is especially vigilant when a state takes liberties with its own obligations. See Energy Reserves Group, 459 U.S. at 412 n. 14, 103 S.Ct. at 705 n. 14 ("When a State itself enters into a contract, it cannot simply walk away from its financial obligations. In almost every case, the Court has held a governmental unit to its contractual obligations when it enters financial or other markets."). The contract clause, if it is to mean anything, must prohibit New York from dishonoring its existing contractual obligations when other policy alternatives are available. This principle has been with us almost as long as our constitutional law:
 
 
 44
 But when the legislature makes a contract with a public officer, as in the case of a stipulated salary for his services, during a limited period, this, during the limited period, is just as much a contract, within the purview of the constitutional prohibition, as a like contract would be between two private citizens.
 
 
 45
 Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 694, 4 L.Ed. 629 (1819) (Story, J., concurring). Were we to uphold this lag-payroll legislation, one wonders if the employees would ever receive their lagged wages, or whether another of the state's perennial "fiscal crises", cf. Matter of Subway-Surface Supervisors v. New York City Transit Authority, 44 N.Y.2d 101, 110, 375 N.E.2d 384, 389, 404 N.Y.S.2d 323, 328 (1978), would justify deferring again, or even cancelling, the lagged wages when they eventually become due. If a state government could so cavalierly disregard the obligations of its own contracts, of what value would its promises ever be?
 
 C. Mootness and Eleventh Amendment Bar
 
 46
 Finally, appellees State of New York, Regan, and Abrams challenge, by supplemental brief, our jurisdiction over this case. They argue that (1) the lag payroll having been fully effectuated as of March 13, 1991, the claim for declaratory and injunctive relief is moot; and (2) since this mootness would limit the plaintiffs' remedy to "retroactive monetary relief", the monetary claim is barred by the eleventh amendment. We reject both arguments.
 
 
 47
 First, the claim for declaratory and injunctive relief is not moot. Although a total of two weeks' salary has already been withheld from the affected employees, the lag payroll continues, and will continue, to impair the state's contractual obligations by deferring every salary check of each employee for a period of two weeks, until the employee leaves the service of the state. At the time the collective bargaining agreements were ratified, N.Y.State Finance Law Sec. 200(1) mandated that state employees' wages "be due from and payable by the state bi-weekly". It is hornbook law that this statute was part of each collective bargaining agreement, since "existing laws [are] read into contracts in order to fix obligations as between the parties". Home Building & Loan Ass'n v. Blaisdell, 290 U.S. at 435, 54 S.Ct. at 239. Thus, the lag-payroll law expressly impaired this obligation of immediate payment contained in the collective bargaining agreements. As we have stated above, such an impairment is not "reasonable and necessary" to further any important public purpose, United States Trust Co., 431 U.S. at 25, 97 S.Ct. at 1519, and will, therefore, be enjoined.
 
 
 48
 Moreover, since we direct the district court to enjoin the lag-payroll law (a purely prospective remedy), the state defendants, "in order to shape their official conduct to the mandate of the [c]ourt's decrees," will have to restore the withheld monies to the affected employees. Edelman v. Jordan, 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974). "Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young, [209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) ]." Edelman, 415 U.S. at 668, 94 S.Ct. at 1358. Since the eleventh amendment does not bar suits against state officers to enjoin violations of federal law, and any monies that will be restored to the plaintiffs from the state treasury are ancillary to the prospective relief which we order, defendants' jurisdictional arguments are meritless.CONCLUSION
 
 
 49
 The State of New York's lag-payroll law violates the contract clause, U.S. Const. art. I, Sec. 10. The judgment of the district court is reversed, and the case is remanded with instructions to (1) enter a declaratory judgment declaring that New York's lag-payroll law violates the contract clause of the United States Constitution; (2) enjoin the continuing effects and application of the lag-payroll law; and (3) enter an appropriate judgment for the plaintiffs which shall include restitution of the lagged wages for all affected employees. Whether or not interest shall be awarded on the restored wages will lie in the equitable discretion of the district court.