[874 NE2d 706, 842 NYS2d 742]

MAYOR OF THE CITY OF NEW YORK, Appellant, v COUNCIL OF THE CITY OF NEW YORK, Respondent, and LILLIAN ROBERTS, as Executive Director of District Council 37, AFSCME, AFL-CIO, et al., Intervenors-Respondents.

Argued April 24, 2007; decided June 12, 2007

## POINTS OF COUNSEL

*Michael A. Cardozo, Corporation Counsel,* New York City (*Alan G. Krams, Mordecai Newman, Leonard Koerner, Spencer Fisher, Larry A. Sonnenshein* and *Tal Golomb* of counsel), for appellant. I. Municipal Home Rule Law § 23 (2) (f) and New York City Charter § 38 (5) provide that any local law that curtails "any power" of an elective officer shall be subject to a mandatory referendum. The Appellate Division majority acknowledges that Local Law Nos. 18 and 19 (2001) of the City of New York curtail mayoral power. It follows that the referendum requirement should apply to those local laws. (*Matter of*

*Fogarty v Warden,* 191 Misc 916, 273 App Div 910, 297 NY 963; *Matter of Heeran v Scully,* 135 Misc 874, 229 App Div 822, 254 NY 344; *Morin v Foster,* 45 NY2d 287; *Shilbury v Board of Supervisors of County of Sullivan,* 54 Misc 2d 979; *Matter of Bauch v City of New York,* 21 NY2d 599; *Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577; *Matter of Sacco v Maruca,* 175 AD2d 578; *Local Govt. Assistance Corp. v Sales Tax Asset Receivable Corp.,* 2 NY3d 524; *Burke v Kern,* 287 NY 203; *Matter of Finegan v Cohen,* 275 NY 432.) II. The purported amendments undermine the Mayor's authority to negotiate the question of whether emergency medical technicians and fire alarm dispatchers are subject to "special and unique" circumstances. That authority derives from Civil Service Law § 201, which confers on the Mayor exclusive power to negotiate terms and conditions of municipal employment on behalf of the City of New York, and from the Collective Bargaining Law, which is itself a product of negotiations between the Mayor and municipal unions. Accordingly, the Taylor Law preempts the purported amendments' curtailment of the Mayor's bargaining authority. (*Matter of Doyle v City of Troy,* 51 AD2d 845; *Board of Educ. for City School Dist. of City of Buffalo v Buffalo Teachers Fedn.,* 89 NY2d 370; *Matter of Levitt v Board of Collective Bargaining of City of N.Y., Off. of Collective Bargaining,* 79 NY2d 120.)

*Elizabeth Fine, General Counsel, Council of the City of New York,* New York City (*Alvin L. Bragg, Jr.,* and *Lauren G. Axelrod* of counsel), for respondent. I. The Mayor lacks standing for his Taylor Law claim and, in any event, that claim fails, because Local Law Nos. 18 and 19 (2001) of the City of New York are valid exercises of powers that were expressly granted to the City Council by the Taylor Law. (*City of New York v Patrolmen's Benevolent Assn. of City of N.Y.,* 89 NY2d 380; *Stark v Goldberg,* 297 AD2d 203; *Sanders v Winship,* 57 NY2d 391; *Matter of Levitt v Board of Collective Bargaining of City of N.Y., Off. of Collective Bargaining,* 79 NY2d 120.) II. The Appellate Division correctly held that Local Law Nos. 18 and 19 (2001) of the City of New York were validly enacted without a referendum. (*Lyles v State of New York,* 3 NY3d 396; *Palmer v Occidental Chem. Corp.,* 356 F3d 235; *Matter of Slominski v Rutkowski,* 62 NY2d 781; *Meredith v Connally,* 38 AD2d 385; *Matter of American Tel. & Tel. Co. v State Tax Commn.,* 61 NY2d 393; *Matter of Fogarty v Warden,* 191 Misc 916, 273 App Div 910, 297 NY 963; *Matter of Heeran v Scully,* 135 Misc 874, 229 App Div 822, 254 NY 344; *Sanders v Winship,* 57 NY2d 391; *Matter of DaimlerChrysler Corp. v Spitzer,* 7 NY3d 653; *Alweis v Evans,* 69 NY2d 199.)

*Gladstein, Reif & Meginnis, LLP,* New York City (*Walter M. Meginniss, Jr.,* and *Anjana Malhotra* of counsel), *Joan Stern Kiok* and *Eddie M. Demmings, General Counsel, District Council 37, AFSCME, AFL-CIO* (*Leonard D. Polletta* of counsel), for intervenors-respondents. I. Local Law Nos. 18 and 19 (2001) of the City of New York are consistent with the Taylor Law's explicit grant of City Council authority to enact such legislation. (*Matter of Levitt v Board of Collective Bargaining of City of N.Y., Off. of Collective Bargaining,* 79 NY2d 120; *Matter of Doyle v City of Troy,* 51 AD2d 845; *Board of Educ. for City School Dist. of City of Buffalo v Buffalo Teachers Fedn.,* 89 NY2d 370; *Suffolk County Police Benevolent Assn. v County of Suffolk,* 273 AD2d 222.) II. Neither the City Charter nor the Municipal Home Rule Law bars the City Council's enactment of Local Law Nos. 18 and 19 (2001) of the City New York without a referendum. (*Matter of DaimlerChrysler Corp. v Spitzer,* 7 NY3d 653; *Tompkins v Hunter,* 149 NY 117; *Connecticut Nat. Bank v Germain,* 503 US 249; *United States v Ron Pair Enterprises, Inc.,* 489 US 235; *City of Amsterdam v Helsby,* 37 NY2d 19; *Matter of Levitt v Board of Collective Bargaining of City of N.Y., Off. of Collective Bargaining,* 79 NY2d 120; *City of Corning v Corning Police Dept. of Corning City Unit of Steuben County Ch., Civ. Serv. Empls. Assn.,* 81 Misc 2d 294, 49 AD2d 689; *Matter of Mooney v Cohen,* 272 NY 33; *Di Prima v Wagner,* 14 AD2d 36, 10 NY2d 728; *Alweis v Evans,* 69 NY2d 199.)

*Riele Morgiewicz,* Albany, for New York Conference of Mayors and Municipal Officials, amicus curiae. I. The doctrine of curtailment embodied in Municipal Home Rule Law § 23 (2) is a core aspect of local democracy and may only be superseded by clear legislative direction. (*Matter of Heeran v Scully,* 135 Misc 874, 229 App Div 822, 254 NY 344; *Morin v Foster,* 45 NY2d 287; *Matter of Yevchak v Raymond,* 63 AD2d 197; *Matter of Fogarty v Warden,* 191 Misc 916, 273 App Div 910, 297 NY 963; *Matter of Radich v Council of City of Lackawanna,* 93 AD2d 559, 61 NY2d 652; *Van Amerogen v Donnini,* 78 NY2d 880; *Local Govt. Assistance Corp. v Sales Tax Asset Receivable Corp.,* 2 NY3d 524.) II. The Appellate Division's unnatural interpretation of the term "any power" improperly undermines that scope of the curtailment doctrine's protection of elected officials' autonomy. (*Shilbury v Board of Supervisors of County of Sullivan,* 54 Misc 2d 979.)

*Hiscock & Barclay, LLP,* Albany (*Mark W. Blanchfield* and *David M. Cost* of counsel), for New York State County Execu-

tives' Association, amicus curiae. I. Local legislation that has the effect of interfering with the municipal chief executive officer's negotiating power in the employee bargaining process is preempted by the Taylor Law. II. The doctrine of curtailment is critical to the preservation of the autonomy of elected officials. The cumulative effect of the Appellate Division's decision would be to reduce such autonomy in contravention of the purpose of the doctrine. (*Loening v Seaman*, 290 NY 527; *Matter of Heeran v Scully*, 135 Misc 874, 229 App Div 822, 254 NY 344; *Morin v Foster*, 45 NY2d 287; *Shilbury v Board of Supervisors of County of Sullivan*, 54 Misc 2d 979; *Matter of Fogarty v Warden*, 191 Misc 916, 273 App Div 910, 297 NY 963; *People v Newman*, 32 NY2d 379, 414 US 1163.)

*Christine Malafi, County Attorney*, Hauppauge (*Ann K. Kandel* of counsel), for County of Suffolk, amicus curiae. I. The First Department incorrectly interpreted Municipal Home Rule Law § 23 (2) with respect to when a local law is subject to mandatory referendum. (*Leader v Maroney, Ponzini & Spencer*, 97 NY2d 95; *Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals of Town of Huntington*, 97 NY2d 86; *Matter of Friss v City of Hudson Police Dept.*, 187 AD2d 94; *Matter of R.A. Bronson, Inc. v Franklin Correctional Facility*, 255 AD2d 723; *Rocovich v Consolidated Edison Co.*, 78 NY2d 509; *Matter of Albano v Kirby*, 36 NY2d 526; *Matter of Heeran v Scully*, 135 Misc 874, 229 App Div 822, 254 NY 344; *Morin v Foster*, 45 NY2d 287.) II. Municipal Home Rule Law § 34 does not contain the limiting language contained in Municipal Home Rule Law § 23 (2) and thus is distinguishable from Municipal Home Rule Law § 23 (2). (*Matter of New York Pub. Interest Research Group v Giuliani*, 228 AD2d 276; *Hampton Hgts. Dev. Corp. v Board of Water Supply of City of Utica*, 140 AD2d 958; *Matter of Yevchak v Raymond*, 63 AD2d 197.)

*Lorna B. Goodman, County Attorney*, Mineola (*Karen Hutson* and *Dennis J. Saffran* of counsel), for County of Nassau, amicus curiae. Section 155 of the Nassau County Charter was enacted by the State Legislature and protects the County of Nassau's voters when changes are proposed that would curtail the powers of officials they elect. (*423 S. Salina St. v City of Syracuse*, 68 NY2d 474, 481 US 1008; *Elfvin v City of Buffalo*, 19 NY2d 280; *Matter of Finegan v Cohen*, 275 NY 432; *Matter of Heeran v Scully*, 135 Misc 874, 229 App Div 822, 254 NY 344; *Morin v Foster*, 45 NY2d 287.)

*Stroock & Stroock & Lavan LLP*, New York City (*Alan M.*

*Klinger, Ernst H. Rosenberger* and *Beth A. Norton* of counsel), for United Federation of Teachers, Local No. 2, American Federation of Teachers, AFL-CIO and others, amici curiae. I. Local Law Nos. 18 and 19 (2001) of the City of New York represent a procedural change, as permitted by the Taylor Law, and do not affect the terms and conditions of employment for emergency medical technicians and fire alarm dispatchers. (*Board of Educ. for City School Dist. of City of Buffalo v Buffalo Teachers Fedn.*, 89 NY2d 370.) II. Local Law Nos. 18 and 19 (2001) of the City of New York are not subject to mandatory referendum.

## OPINION OF THE COURT

Sмith, J.

The Mayor of New York City challenges the validity of two local laws, passed by the City Council over his veto, that give certain fire department employees the status of "uniformed" fire service members for collective bargaining purposes. Like Supreme Court and the Appellate Division, we reject the Mayor's challenge. We hold that the local laws are not preempted by State law, and that the Council had the power to enact them without a referendum.

### Facts and Procedural History

Local Law Nos. 18 and 19 (2001) of the City of New York confer "uniformed" status on people employed by the New York City Fire Department as fire alarm dispatchers and emergency medical technicians (EMTs). The effect of the local laws is to require the Mayor to bargain with unions representing these employees, rather than with unions representing the majority of employees citywide, over such matters as overtime and "time and leave" rules. To make this understandable, we must summarize several features of the State and local legislation that governs collective bargaining with public employees.

In general, labor relations in the public sector in New York State are governed by the Taylor Law, Civil Service Law § 200 *et seq*. But the Taylor Law contains a local option provision, Civil Service Law § 212, which permits local governments to enact their own counterparts to certain sections of the Taylor Law, and thus to displace the Taylor Law to that extent. The State statute requires that the local laws be "substantially equivalent" to the "provisions and procedures" of the Taylor Law itself (Civil Service Law § 212 [1], [2]). As to New York City, however, the issue of substantial equivalence can be raised only

in a declaratory judgment action brought by the Public Employment Relations Board (PERB) in New York County Supreme Court; unless and until such a challenge is brought and upheld, the City counterparts to Taylor Law provisions "shall be of full force and effect" (Civil Service Law § 212 [2]).

In 1967, the year of the Taylor Law's enactment, New York City exercised its local option by adopting a local law known as the Collective Bargaining Law (CBL) (Local Law No. 53 [1967] of City of NY § 2, codified as Administrative Code of City of NY § 1173-1.0 *et seq.* [now § 12-301 *et seq.*]). Later the same year, the Mayor, in an executive order issued "pursuant to the New York City Collective Bargaining Law," directed that there be citywide, rather than unit-by-unit, bargaining on certain subjects as to which citywide uniformity was thought especially important (Executive Order 52 of 1967 § 5 [a] [2], reprinted in City Record, Oct. 6, 1967, at 6341, 6342). Five years later, the substance of this provision of the Mayor's order was incorporated, by local law (Local Law No. 1 [1972] of City of NY § 10), into the CBL itself. It is now codified as New York City Administrative Code § 12-307 (a) (2), which provides:

> "*matters which must be uniform for all employees subject to the career and salary plan, such as overtime and time and leave rules, shall be negotiated only with* a certified employee organization, council or group of certified employee organizations designated by the board of certification as being the certified *representative or representatives of bargaining units which include more than fifty percent of all such employees*, but nothing contained herein shall be construed to deny to a public employer or certified employee organization the right to bargain for a variation or a particular application of any city-wide policy or any term of any agreement executed pursuant to this paragraph where considerations special and unique to a particular department, class of employees, or collective bargaining unit are involved" (emphasis added).

Thus, citywide collective bargaining is the general, though not invariable, rule as to "matters which must be uniform for all employees subject to the career and salary plan, such as overtime and time and leave rules." The 1967 executive order, however, made "uniformed" employees an exception to this rule, and the exception, like the general rule, was added to the

CBL by local law in 1972. Thus, New York City Administrative Code § 12-307 (a) (4) provides: "all matters, including but not limited to pensions, overtime and time and leave rules which affect employees in the uniformed police, fire, sanitation and correction services . . . shall be negotiated with the certified employee organizations representing the employees involved."

No party in this case disputes the validity of the 1967 local law that adopted the CBL, the 1967 executive order issued under the CBL's authority, or the 1972 local law incorporating provisions of the executive order in the CBL.

The local laws at issue here, adopted in 2001, expanded the definition of "employees in the uniformed . . . fire . . . service[ ]." They added to New York City Administrative Code § 12-307 (a) (4) language saying that, for purposes of that paragraph, "employees of the uniformed fire service shall also include" fire alarm dispatchers, EMTs and their supervisors. Thus, the 2001 local laws made the dispatchers and EMTs, like firefighters and police officers, exempt from section 12-307 (a) (2)'s requirement of citywide bargaining.

The 2001 local laws were passed over the veto of then-Mayor Giuliani, who responded by bringing this action for a declaratory judgment that the local laws are invalid, and an injunction against their enforcement. Supreme Court granted summary judgment in the Council's favor, declaring the laws valid. The Appellate Division affirmed, with two Justices dissenting. The Mayor appeals as of right, pursuant to CPLR 5601 (a), and we now affirm.

## Discussion

The Mayor argues (1) that Local Laws 18 and 19 of 2001 are preempted by the Taylor Law and (2) that they were enacted in violation of mandatory referendum provisions of the Municipal Home Rule Law and the New York City Charter. We reject both arguments.

## I

As we mentioned above, the Taylor Law permits local governments to supersede certain of its provisions, so long as the provisions and procedures of the local legislation are "substantially equivalent" to the ones they supersede (Civil Service Law § 212). The Mayor does not argue here that Local Laws 18 and 19 fail the substantial equivalence test, no doubt because he lacks standing to make that argument; only PERB can chal-

lenge New York City local laws on substantial equivalence grounds (Civil Service Law § 212 [2]).

The Mayor does argue, however, that the local laws are inconsistent with the Taylor Law's definition of "agreement": "the result of the exchange of mutual promises between the chief executive officer of a public employer and an employee organization" (Civil Service Law § 201 [12]). It has been held, and the parties here do not dispute, that the Taylor Law prohibits local legislative bodies from usurping the executive's prerogative to agree with unions on terms and conditions of employment (*Matter of Doyle v City of Troy*, 51 AD2d 845 [3d Dept 1976]). But these local laws do not violate that prohibition. They do not dictate the substantive terms of an agreement; they prescribe (as to certain issues) the procedure by which agreements may be reached—bargaining with the unions representing dispatchers and EMTs, rather than bargaining with unions representing a majority of employees subject to the citywide career and salary plan.

The regulation of bargaining procedures generally, and specifically the procedure by which bargaining units are determined, is a proper subject of local legislation. The Taylor Law provides, in Civil Service Law § 206 (1), that a local government "acting through its legislative body, is hereby empowered to establish procedures . . . to resolve disputes concerning the representation status of employee organizations." While this statute is not directly applicable here—the CBL has superseded it—it refutes the idea that procedures to determine the appropriate unit of bargaining are a subject beyond the reach of a local legislature.

The Mayor's preemption argument proves too much. If these 2001 local laws, which expanded the definition of "uniformed" employees to include dispatchers and EMTs, are preempted, how could the 1972 local law that exempted uniformed employees in general from citywide bargaining be valid? For that matter, how could the same local law have provided for citywide rather than unit-by-unit bargaining on certain issues? And how could the original CBL, enacted by local law in 1967, have given the Mayor authority to provide by executive order for both the general rule and the exception?

The answer offered by the Mayor, and by the dissent, is that the 1967 executive order and the 1972 local law were based on an agreement negotiated between the Mayor and the unions involved. The dissent implicitly asserts that the City's power to

legislate in this area extends only to ratifying agreements the Mayor and the unions have already reached. But we see nothing in the Taylor Law, and nothing in any decision interpreting it, to suggest the existence of any such limitation on legislative authority; and we reject as unsound the principle that a legislative body's power to pass laws can be conferred or withheld by the executive's agreement, or failure to agree, with labor representatives on proposed legislation.

Local Laws 18 and 19 are not preempted by the Taylor Law.

## II

■ Municipal Home Rule Law § 23 (2) (f) says: "Except as otherwise provided by or under authority of a state statute, a local law shall be subject to mandatory referendum if it . . . [a]bolishes, transfers or curtails any power of an elective officer." Similarly, New York City Charter § 38 (5) provides: "A local law shall be submitted for the approval of the electors . . . if it . . . [a]bolishes, transfers or curtails any power of an elective officer." We hold that Local Laws 18 and 19 do not curtail any power of the Mayor within the meaning of these sections. We do not reach the question of whether the exception clause of Municipal Home Rule Law § 23 (2) applies.

The Mayor's theory is that Local Laws 18 and 19 curtail his power because he has less flexibility in bargaining with unions than he would have if the laws had not been passed. Before the enactment of these local laws, the Mayor could insist on bargaining with citywide representatives over the overtime and time and leave rules of fire alarm dispatchers and EMTs, unless "special and unique" considerations called for a different approach (Administrative Code of City of NY § 12-307 [a] [2]). The 2001 local laws require the Mayor to bargain directly with the unions "representing the employees involved" over all terms of their employment (Administrative Code § 12-307 [a] [4]). But this kind of limitation on the Mayor's freedom of action is not the sort of curtailment of power that triggers a mandatory referendum.

A great many local laws limit the actions the Mayor or another elected official may take. A local law requiring the recycling of solid waste prevents the Mayor from ordering the sanitation department to dispose of such waste less expensively (*see* Administrative Code § 16-305; *Matter of Natural Resources Defense Council v New York City Dept. of Sanitation*, 188 AD2d 415 [1st Dept 1992]); a local law suspending alternate side of

the street parking on certain holidays prevents the Mayor from enforcing it on those days (*see* Administrative Code § 19-163); a local law requiring an office to be open at certain hours prevents the Mayor from closing it (*see id.* § 7-623). But the Municipal Home Rule Law and the City Charter cannot sensibly be read to subject all local laws of this kind to a mandatory referendum. If they were, there would be more referendums than any community could well manage.

The requirement of a referendum for legislation that "curtails any power of an elective officer" must be read as applying only to legislation that impairs a power conferred on the officer as part of the framework of local government. For example, a local law limiting the power of New York City's Mayor to appoint commissioners, or to prepare a budget, or to create or abolish positions within his executive office would require a referendum (*see* NY City Charter §§ 6, 8 [f]; § 225 [a]). But, as a general rule, a law that merely regulates the operations of city government, in collective bargaining or in some other area, is not a curtailment of an officer's power.

*Matter of Slominski v Rutkowski* (62 NY2d 781 [1984]) illustrates the distinction. In that case, the Erie County Comptroller challenged county legislation that prohibited the filling of vacancies in certain county offices in the absence of a certificate of necessity from the County Executive. The effect of the legislation was to prevent the Comptroller from doing something she could otherwise have done—fill vacancies in her office without getting a certificate of necessity. But we held the Comptroller's powers had not been curtailed, and the referendum requirement of Municipal Home Rule Law § 23 (2) had not been triggered, because the powers given the Comptroller by the County Charter were unimpaired. We said: "the only power the County Charter gives [the Comptroller] is the power to fill positions in her office as those positions are approved. That is unchanged. She, and no one else, may appoint whomever she chooses to the vacancies" (62 NY2d at 785).

So here, the Mayor's power in the New York City governmental structure is unimpaired. A local law prescribing a procedural rule for collective bargaining is not an encroachment on the Mayor's role in City government. The limitation on his freedom to act is merely a consequence of legislative policymaking. By contrast, the cases the Mayor relies on all involved limitations on an elected officer's structural authority (*see Morin v Foster*, 45 NY2d 287 [1978] [limitation on power to appoint county

manager held to require referendum]; *Matter of Fogarty v Warden*, 191 Misc 916 [Sup Ct, Orange County 1948], *affd* 273 App Div 910 [2d Dept 1948], *affd* 297 NY 963 [1948] [limitation on power to dismiss city manager held to require referendum]; *Matter of Heeran v Scully*, 135 Misc 874 [Sup Ct, Rensselaer County 1930], *affd* 229 App Div 822 [3d Dept 1930], *affd* 254 NY 344 [1930] [adding members to board created by city charter held to curtail power of existing members]; *Mayor of City of N.Y. v Council of City of N.Y.*, 280 AD2d 380 [1st Dept 2001] [limitation on Mayor's authority to appoint members of police investigatory board held to require referendum]).

Local Laws 18 and 19 were within the power of the City Council to enact without a referendum.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

READ, J. (dissenting). The Taylor Law preempts Local Law Nos. 18 and 19 (2001) of the City of New York. The provisions of the Collective Bargaining Law (CBL) that the City Council amended by these local laws delineate the scope of collective bargaining, and were initially hammered out by the Mayor and the municipal unions at the bargaining table. Expansion of the scope of collective bargaining is not within the sphere of legislative authority conferred upon the Council by section 212 of the Civil Service Law. As a result, these CBL provisions may be altered by the Mayor and the unions in future negotiations, but not by the Council in local law. To grasp why this is so requires a rudimentary understanding of the now largely forgotten origin and history of what has become New York City Administrative Code § 12-307 (a) (2) and (4), and the relationship of these local laws to the Taylor Law.

### The Tripartite Agreement

The City first endorsed a policy of public sector collective bargaining in the 1950s (*see* Michael Fox, *Criteria for Public Sector Interest Arbitration in New York City: The Triumph of 'Ability to Pay' and the End of Interest Arbitration*, 46 Alb L Rev 97, 105 [1981]). By 1965, however, it had become apparent that the City did not have effective conflict-resolution procedures in place. That year, employees of the Department of Welfare conducted the first successful strike by municipal workers (*id.* at 106-107). The City's attempt to invoke the Condon-Wadlin Act (*see* former Civil Service Law § 108 [prohibiting strikes by

public employees and providing severe penalties for violations])
failed to end the work stoppage, and the City was forced to
submit disputed issues to an impartial fact-finding panel (46
Alb L Rev at 107). This panel resolved the immediate contro-
versy and, more importantly, required the Mayor to appoint a
tripartite panel comprised of city officials, civil service union
representatives and labor relations experts to study and recom-
mend improvements in the City's municipal labor relations
procedures (*id.* at 107-108).

The tripartite panel's report, issued on March 31, 1966,
included a Memorandum of Agreement (Agreement) negotiated
by the Mayor's designees (the deputy mayor and the corpora-
tion counsel) on behalf of the City, and seven unions represent-
ing a majority of municipal workers (District Council 37, State,
County and Municipal Workers' Union, AFL-CIO; Uniformed
Firemen's Association, Local 94, AFL-CIO; Patrolmen's Benevo-
lent Association; Plumbers' Union, Local 1, AFL-CIO; Building
Service Employees' Union, AFL-CIO; Local 832, International
Brotherhood of Teamsters; and Superior Officers' Council and
Sergeants Benevolent Association of NY City Police Depart-
ment). The Agreement set forth "procedures which the
signatories . . . unanimously deem[ed] to be necessary and de-
sirable for the effectuation of collective bargaining, and of the
peaceful settlement of disputes, between the City and the
organizations representing its employees."

The signatories also "unanimously recommend[ed] that the
substance of the provisions of the enclosed [Agreement] be
enacted into law by an Executive Order . . . , and, to the extent
necessary, by a Local Law, both of which shall be uniformly ap-
plicable to all organizations representing City employees."
Similarly, Section IX of the Agreement, entitled "Effective
Date," provided that "[t]he foregoing provisions and procedures
shall not become effective unless and until they are enacted into
law by an Executive Order and a Local Law as set forth above"
(*see* Hanslowe, *Labor Relations Law*, 18 Syr L Rev 247, 252
[1966] [the Agreement "represent(ed) a milestone in the
development of governmental labor relations through discussion
and negotiation *to be followed by ratification in the form of
legislative and executive action*" (emphasis added)]). At the
time, of course, there was no statewide law granting public em-
ployees the right to form unions of their choosing, free from
employer interference, and giving those unions the right to
negotiate with the public employer over terms and conditions of
employment.

Section II, entitled "Scope of Collective Bargaining," created the so-called pyramid structure or two-tiered system of bargaining whereby the City bargained on issues such as wages with the unions representing career and salary plan employees, but bargained on citywide issues such as overtime and time and leave rules and pensions "with an employee organization or council or group of employee organizations representing more than 50% of all Career and Salary Plan employees." The Agreement also provided that nothing about the requirement to negotiate certain issues citywide would "prevent the City from meeting with any employee organization representing employees who are affected for the purpose of hearing their views and proposals on such city-wide matters or pensions." Section II also specified that "[t]he City shall continue to bargain on all matters within the scope of collective bargaining with organizations representing employees in the Police, Fire, Sanitation and Correction Services."[1]

## Local Law 53 and Executive Order 52 of 1967

To implement the Agreement, the Council adopted Local Law No. 53 (1967) of the City of New York, effective September 1, 1967, which created the Office of Collective Bargaining, including a seven-member Board of Collective Bargaining (two City representatives, two labor representatives, and three impartial members), and the Board of Certification. The salaries and expenses of the impartial members of the Board of Collective Bargaining were shared by the City and the Municipal Labor Committee, "an association known by that name created pursuant to a memorandum dated March thirty-first, nineteen hundred sixty-six [i.e., the Agreement], as amended, signed by representatives of the city and certain employee organizations" (former Administrative Code § 1173-3.0 [k], as added by Local Law 53 § 2).

Local Law 53 provided procedures for the final determination of representation questions; the mediation of contract negotiations; and impasse panels. It also set up procedures for the arbitration of grievances; for interpretation of its provisions; for final determinations as to the scope of collective bargaining

---

1. Relatedly, the Board of Estimate excluded these uniformed services from the career and salary plan when first adopting it in 1954 (*see* Journal of Proceedings of Meeting of Board of Estimate, July 9, 1954, at 10225 [excluding from career and salary plan "(p)ositions in the uniformed forces of the Police, Fire, Sanitation and Correction Services"]).

under the terms of the applicable executive order, or the arbitrability of particular grievances; and for ascertaining if the City or a particular union had given full-faith compliance to the law's requirements and obligations. As for the scope of bargaining, former section 1173-3.0 (m) of the Administrative Code stated that "[t]he term 'matters within the scope of collective bargaining' shall mean matters designated to be within the scope of collective bargaining *by executive order*" (emphasis added). In addition, former section 1173-4.0 (a) specified in relevant part that the Administrative Code's provisions were "applicable only" to "[a]ll mayoral agencies and to the employees and employee organizations thereof, *provided that the mayor elects by executive order* to make such provisions applicable to all such agencies, [employees and employee] organizations" (emphasis added).

Concomitantly, the Mayor issued Executive Order 52 of 1967. Section 5, entitled "Matters Within the Scope of Collective Bargaining," stated at section 5 (a) that the City would have the duty to bargain in good faith

> "(2) with *a certified employee organization, council or group of certified employee organizations designated by the Board of Certification as representing more than 50 per cent of all employees subject to the Career and Salary Plan, and only with such employee organization or organizations, on City-wide matters which must be uniform for all such employees, such as overtime, and time and leave rules.* The terms agreed upon in such bargaining shall be applicable to and binding upon all such employees . . . . The foregoing shall not: (A) prevent the City from meeting with any other employee organization representing such employees for the purpose of hearing the views and requests of its members on such matters . . . ; or *[be] construed to deny the City or a certified employee organization the right to bargain for a variation* or a particular application of any city-wide policy or any term of an agreement executed pursuant to this Section 5 (a) (2) governing any City-wide matter, *where considerations unique to a particular department, class of employees, or collective bargaining unit* are involved.
>
> "(3) *with an employee organization, council or group*

*of employee organizations designated by the Board of Certification as representing more than 50 per cent of all employees within a department on matters which must be uniform for all employees in the department, but only if such organization, or in the case of a group or council, each organization in such group or council, has been previously certified as a City-wide bargaining representative for an appropriate bargaining unit.* The foregoing shall not prevent the City from meeting with any other employee organization representing such employees for the purpose of hearing the views and requests of its members on such matters . . . .

"(4) *with certified employee organizations representing employees in the uniformed forces of the police, fire, sanitation and correction services on City-wide matters, including, but not limited to pensions, overtime, and time and leave rules* insofar as such issues affect the particular service involved.

"(5) *on pensions for employees other than those in the uniformed forces referred to in Section 5 (a) (4) herein, only with a certified employee organization, council, or group of certified employee organizations designated by the Board of Certification as representing more than 50 per cent of all employees included in the pension system involved*" (Executive Order 52 of 1967, dated Sept. 29, 1967, reprinted in City Record, Oct. 6, 1967, at 6342 [emphasis added]).

Thus, Executive Order 52 implemented two-tiered bargaining and exempted police, fire, sanitation and correction services employees from it, as agreed to by the Mayor and the unions in 1966 in the Agreement. Executive Order 52 repeated the language from the Agreement to the effect that citywide bargaining would not prevent the City from meeting with any union for purposes of hearing its views and proposals on citywide matters or pensions; and declared that its provisions respecting citywide bargaining should not be construed to deny the City or any union the right to bargain for a "variation or a particular application" of a citywide policy or term of agreement "where considerations unique to a particular department, class of employees, or collective bargaining unit are involved."

## The Taylor Law and Chapter 24 of the Laws of 1969

In 1967, the Legislature adopted the Public Employees' Fair Employment Act, commonly known as the Taylor Law (L 1967, ch 392, adding Civil Service Law § 200 *et seq.*), a pioneering piece of legislation that significantly changed the relationship between public employees and employers in New York. Most provisions of the Taylor Law took effect on September 1, 1967, or contemporaneously with the culmination of the City's efforts to implement the Agreement through Local Law 53 and Executive Order 52.

The enacted legislation was a compromise version of a bill based on recommendations in the Final Report of the Governor's Committee on Public Employee Relations (the Taylor Committee), submitted to Governor Rockefeller on March 31, 1966 (*see* Lefkowitz, Osterman and Townley, Public Sector Labor and Employment Law, at 23 [2d ed]). "The Democratic [A]ssembly was concerned primarily with preserving the right of New York City to institute a labor relations program for its employees, which had been developed by its own committee of experts," the tripartite panel, and so, "as part of its price for passing the bill based upon the Taylor Committee report," the Assembly "obtained an amendment that authorized local governments to enact local laws substantially equivalent to the state law" (*id.*).

This amendment was Civil Service Law § 212, which allows localities to establish substantially equivalent provisions and procedures, to be administered by a local version of the Public Employment Relations Board (PERB), or a "mini-PERB," such as the City's Office of Collective Bargaining. Numerous provisions of the Taylor Law may not be superseded by local law, though. Section 212 (1) lists those statutes that remain directly applicable in mini-PERB jurisdictions, and section 201 (definitions) is among them. As a result, only those statutes *not* listed in section 212 (1) may be replaced or modified by substantially equivalent local laws. These are generally sections 206 and 207 (representation disputes), 209 (impasse resolution), and 210 (3) (strike prohibitions involving the forfeiture of a union's checkoff privileges). In addition, Civil Service Law § 205 (5) (d) confers improper practice jurisdiction upon the Board of Collective Bargaining (*see generally*, Lefkowitz at 796-797).

Municipal employee strikes continued to plague the City during the late 1960s, which eventually caused the Legislature to question the efficacy of the City's collective bargaining

procedures. The Legislature ultimately enacted chapter 24 of the Laws of 1969, which required the City to make a report by August 1, 1969, to the leaders of the Senate and Assembly and PERB "of the steps taken and a plan designed to bring [its] practices . . . into substantial equivalence with [the Taylor Law]," particularly focusing on "making effective the jurisdiction of the office of collective bargaining, the need for a specified final step in the impasse procedures, and the relation of negotiations and impasse procedures to budget submission dates" (see L 1969, ch 24, § 11). If the City failed to submit a timely report, it would lose the benefit of Civil Service Law § 212 (2), which allowed the City's local law provisions supplanting statutes not enumerated in Civil Service Law § 212 (1) to remain effective without PERB's prior approval. This legislation also directed PERB to submit to the leaders of the Senate and Assembly by December 1, 1969, "its comments and recommendations regarding" the City's report and plan (L 1969, ch 24, § 11).

In fact, on August 1, 1969, the City issued a document entitled "Report Submitted Pursuant to Chapter 24, Laws of 1969, Designed to Bring New York City's Labor Relations Practices into Substantial Equivalence with the Public Employees' Fair Employment Act." This report's recommendations, which addressed the three topics called out by the Legislature, were generally approved by PERB.

### Local Law 1 of 1972

On December 29, 1971, the New York City Council Committee on Civil Service and Labor reported that the bill subsequently enacted as Local Law No. 1 (1972) of the City of New York, which was effective on January 12, 1972, "was introduced at the request of the Office of Collective Bargaining and represents the joint and cooperative effort by the Municipal Labor Committee, The City of New York, and the Office of Collective Bargaining" (2 Proceedings of Council of City of NY, from July 13, 1971 to Dec. 29, 1971, at 678). According to the Committee, the bill

> "amend[ed] the [CBL] so that the law, as originally enacted by [the] Council in 1967, together with the amendments as set forth herein, is in substantial

equivalence with . . . 'The Taylor Law'.[2] This action complies with the mandate of the Taylor Law. In addition, the amendments reflect the four years of experience of the OCB.

"The Taylor Law[,] enacted by the State Legislature in 1967, contained a 'home rule' provision which authorized local public employers, through their legislative bodies, to adopt provisions and procedures concerning a labor relations program and policy affecting the employees of local public employers. It was pursuant to this home rule provision that the Council enacted Local Law 53—1967.

"In 1969, the State Legislature amended the Taylor Law requiring the Mayor . . . to submit to the Legislature a report of the steps taken and a plan designed to bring the labor relations practices of The City of New York into substantial equivalence with the Taylor Law. This bill is based on the Mayor's report [to PERB and the Legislature] and constitutes the plan designed to bring the City's labor relations policies, including finality, into substantial equivalence with state law" (*id.*).

In sum, the Council ratified pursuant to Civil Service Law § 212 what the Mayor and the unions negotiated and what the State demanded from the Mayor to show substantial equivalence. As particularly relevant to this appeal, the Committee noted that the bill codified "substantial portions of Executive Order 52 including the duty to bargain and *[the] scope of bargaining, with appropriate representatives*" (*id.* [emphasis added]). In fact, Local Law 1 § 6 amended former section 1173-3.0 (m) of the Administrative Code to define the term "matters within the scope of collective bargaining" as "matters specified in section 1173-4.3 of this chapter." This newly added section 1173-4.3 incorporated all the substantive provisions of section 5 of Executive Order 52 of 1967, which were grounded in the Agreement negotiated by the City and the unions in 1966. These provisions are now found in section 12-307 (a) (2) and (4) of the Administrative Code, which are at the heart of this appeal.

**2.** Local Law No. 2 (1972) of the City of New York, which also became effective on January 12, 1972, cured what the State considered to be perhaps the major deficiency in the City's collective bargaining procedures by making an impasse panel's recommendations final and binding.

## Taylor Law Preemption

Section 12-307 of the Administrative Code is entitled "Scope of collective bargaining; management rights." Section 12-307 (a) (2)—which derives from former section 1173-4.3 (Local Law 1 of 1972 § 10), which, in turn, derives from Executive Order 52 of 1967, which, in turn, derives from the Agreement negotiated by the City and the unions in 1966—specifies that

> "matters which must be uniform for all employees subject to the career and salary plan, such as overtime and time and leave rules, shall be negotiated only with a certified employee organization, council or group of certified employee organizations designated by the board of certification as being the certified representative or representatives of bargaining units which include more than fifty percent of all such employees, but nothing contained herein shall be construed to deny to a public employer or certified employee organization the right to bargain for a variation or a particular application of any city-wide policy or any term of any agreement executed pursuant to this paragraph where considerations special and unique to a particular department, class of employees, or a collective bargaining unit are involved."

Section 12-307 (a) (4) of the Administrative Code—which also derives from former section 1173-4.3 (Local Law 1 of 1972 § 10), which, in turn, derives from Executive Order 52 of 1967, which, in turn, derives from the Agreement negotiated by the City and the unions in 1966—specifies that "all matters, including but not limited to pensions, overtime and time and leave rules which affect employees in the uniformed police, fire, sanitation and correction services, . . . shall be negotiated with the certified employee organizations representing the employees involved."

In Local Laws 18 and 19 of 2001, the Council amended section 12-307 (a) (4) to include fire alarm dispatchers, EMTs and advanced EMTs and their respective supervisors within the definition of employees in the uniformed services. This changes the scope of collective bargaining and takes off the bargaining table the question of whether or not "considerations special and unique" to these classes of employees justify a variation from the citywide agreement regarding pensions, overtime and time and leave rules. In enacting Local Laws 18 and 19, the Council declared that special and unique considerations exist, allowing

these employees to make an end run around collective bargaining. The Mayor correctly protests that the Council may not do this because section 201 (12) of the Civil Service Law (Taylor Law) confers upon him the exclusive authority to negotiate with municipal unions on the City's behalf, and local law may not supersede this authority (*see* Civil Service Law § 212 [1]; *see also Matter of Yonkers P.B.A. [City of Yonkers]*, 23 PERB ¶ 4519, at 4540 [1990] [city's mayor properly refused to implement pension benefit agreed to by city's legislative body and PBA and not negotiated or otherwise endorsed by mayor because "a public employer's duty to negotiate rests not with its legislative body but with its chief executive officer, and any intrusion into the negotiations process by the legislative body must be by agreement of the parties"]).

The Council contends that the changes to the CBL brought about by Local Laws 18 and 19 are "merely procedural" and do not confer substantive terms and conditions of employment. To say that the scope of collective bargaining is merely procedural is to confer upon the Council powers and authority vested with the Mayor under section 201 (12) of the Civil Service Law. The Mayor has certain management rights allowing him to enforce limitations on the scope of collective bargaining. He is free to alter the scope of collective bargaining during negotiations with public employees, although he may not, of course, limit it more narrowly than the "terms and conditions of employment" outlined in the Taylor Law. The Mayor may negotiate away a management right by, for example, expanding the job titles exempt from the citywide agreement.

The majority intimates that the Council may similarly cede a management right because Local Laws 18 and 19 have something to do with "the procedure by which bargaining units are determined," which is "a proper subject of local legislation," citing Civil Service Law § 206 (1) (addressing disputes concerning the representation status of employee organizations) (majority op at 31). Supreme Court similarly tried to characterize Local Laws 18 and 19 as somehow substituting for Civil Service Law § 207, a Taylor Law provision that a local legislature may supplant with its own substantially equivalent provisions and procedures. But Local Laws 18 and 19 do not address representation status as commonly understood. Disputes over representation status generally relate to which job titles properly belong in a bargaining unit, or which union properly represents a unit (*see* McKinney's Cons Laws of NY, Book 9, Civil Service Law

§ 207, Notes of Decisions). Further, as the majority concedes, the CBL otherwise supersedes the Taylor Law's provisions for determining representation status. Importantly, section 12-309 (b) of the Administrative Code commits representation disputes to the Board of Certification, not the Council. Indeed, it is hard to imagine that any local law authorizing a legislative body (rather than a mini-PERB) to make a unit determination would ever pass muster as substantially equivalent to the Taylor Law.

Of course, the Taylor Law does not *require* a mini-PERB jurisdiction to develop its substantially equivalent provisions and procedures through collective bargaining. Historically—and uniquely—this is simply what the City chose to do to preserve the delicate balance in the complex relationships and competitive interests typifying its public sector labor management relations. As a result, section 212 may very well authorize the Council unilaterally to enact a local law amending the Administrative Code's provisions and procedures in those areas where this statute specifically grants the power to legislate (e.g., representation status or impasse procedures). In short, I am not "implicitly assert[ing] that the City's power to legislate . . . extends only to ratifying agreements the Mayor and the unions have already reached" (majority op at 31-32). I am asserting, however, that Local Laws 18 and 19 do not fit within any of those areas where section 212 authorizes the Council to act on its own. Specifically, they have nothing to do with the only such area even alluded to by Supreme Court and the majority—representation status.

The majority also argues that the Mayor's preemption argument "proves too much" because if the 2001 local law is preempted, the two-tiered system and its exemptions must have been bogus to begin with (majority op at 31). This proposition springs from the false premise that the scope of bargaining derives its existence and force from local law originating with the Council. In order to explain away a plainly inconsistent fact—that the two-tiered system and its exemptions were in place from 1967 through the end of 1971 *without* benefit of local law—the majority advances the novel notion that this was only because the original CBL "author[ized]" the Mayor "to provide by executive order for both the general rule and the exception" (majority op at 31). But Local Law 53 of 1967 simply deferred to the Mayor, stating that "matters within the scope of collective bargaining" were to embrace whatever he designated by executive order. Mayors had exercised authority over the scope of col-

lective bargaining long before 1967. Indeed, Executive Order 52 of 1967 superseded Executive Order 49 of 1958, which granted various rights to employees, including the right to engage in collective bargaining (*see generally* Ruffo, *The Residue of Sovereignty in New York Public Employment*, 39 Alb L Rev 165, 174 [1975]). The two-tiered system and its exemptions, expressed in section 5 of Executive Order 52, were not rooted in the original CBL. Instead, they were called for by provisions of the Agreement negotiated between the Mayor and the unions in 1966, which the Council later ratified when it incorporated section 5 into Local Law 1 of 1972.

This was once widely acknowledged. As Eric J. Schmertz, a preeminent labor law expert and an original impartial member of the Board of Collective Bargaining observed: "Certain provisions of the [CBL] are the result of collective bargaining relations between the City and its employees *which existed prior to the enactment of the [CBL]. One of these is a section of the [CBL] which creates various levels of bargaining*" (Schmertz, *The New York City Fire Department Under the New York City Collective Bargaining Law*, 3 Hofstra L Rev 605, 611 [1975] [emphasis added], citing former Administrative Code § 1173-4.3).

The unions also once recognized that the Council did not have the authority unilaterally to amend section 12-307 of the Administrative Code to expand the definition of employees in the uniformed services. When the union representing district attorney investigators was frustrated in its efforts to slip free of the citywide agreement, it turned to the Legislature for relief. In 1989, the Legislature amended section 12-307 of the Administrative Code so as to include district attorney investigators among the employees in the uniformed services (*see* Budget Report on Bills, Bill Jacket, L 1989, ch 776, at 18 [recommending veto because measure is "an attempt to legislatively attain what was not successfully negotiated in the collective bargaining process"]). To the dismay of a succession of Mayors, the Legislature may enact legislation that trumps a Mayor's position in collective bargaining. Until the majority's decision today, the Council was not similarly empowered.

In sum, the Taylor Law legitimizes and protects agreements collectively bargained between a public employer and a public employee union, whether or not the agreement's terms, or some of them, are also recited in statute or local law (*see* Civil Service Law §§ 204, 204-a). The majority concludes, however, that if a legislative body ratifies an agreement (here, the collectively

bargained provisions establishing the two-tiered system), a fortiori, it must be empowered subsequently to amend what it has ratified (here, Local Laws 18 and 19). This proposition conflicts with the Taylor Law. For example, after the State finishes collective bargaining over a new contract with its public employee unions, the Legislature routinely amends the Civil Service Law to implement the agreement by (at a minimum) setting out the salary schedules that the Governor and the unions have agreed upon (*see e.g.* L 2004, ch 103). No one would ever suggest that (absent some amendment to the Taylor Law) the Legislature might have authority to enact legislation revising these salary schedules unilaterally because they were initially ratified in legislation (*see Association of Surrogates & Supreme Ct. Reporters within City of N.Y. v State of New York*, 78 NY2d 143 [1991] [recognizing role of Legislature in ratifying collective bargaining agreements and holding that, after having once ratified multiyear agreement, Legislature may not subsequently enact legislation altering negotiated payroll schedule even though annual appropriations are required]). Similarly, the Council may not expand the exemptions from the citywide agreement just because it codified in local law the scope of bargaining provision that the Mayor and the unions agreed upon at the bargaining table.

As the Mayor laments, Local Laws 18 and 19 have put into play rights and obligations considered settled for nearly 40 years. Indeed, their enactment in 2001 likely signals the demise of the two-tiered system: in 2005, the Council adopted Local Law No. 56 (2005) of the City of New York to list numerous additional job titles in various departments, which the Council unilaterally deemed exempt from the citywide agreement. Because the Taylor Law prohibits the Council from operating as a freelance negotiator at liberty to make concessions on the scope of bargaining at the Mayor's expense, I respectfully dissent.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO, PIGOTT and JONES concur with Judge SMITH; Judge READ dissents in a separate opinion.

Order affirmed, with costs.